## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PAUL W. COSBY, M.D.,** | : |
| | : |
| **Plaintiff,** | : |
| | : **3:10-CV-01881** |
| **v.** | : |
| | : **(JUDGE MARIANI)** |
| **RENEE MAGNOTTA, et al.,** | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. Introduction

Presently before the Court are cross-motions for summary judgment. (Docs. 52; 62.)

Plaintiff Paul Cosby, a medical doctor, filed this action alleging violations of his constitutional

rights stemming from an alleged search, seizure, and subsequent criminal prosecution for

illegal mishandling and distribution of prescription drugs. Now, each side seeks summary

judgment on the following counts: illegal seizure under 42 U.S.C. § 1983 (Count I) and

illegal search under § 1983 (Count II).[1] In addition, Defendants also seek summary

judgment on the counts of conspiracy to violate § 1983 (Count III) and a supervisory liability

---

[1] Plaintiff also seeks summary judgment on his claims of malicious prosecution (Count IV) and abuse of process (Count V). (*See* Pl.'s Brief in Supp. of Pl.'s Mot. for Summ. J., Doc. 54, at 33.) However, these claims were already voluntarily withdrawn by stipulation of the parties as against Defendant Magnotta, (*see* Doc. 24), and the Court subsequently approved that stipulation, (*see* Doc. 25), so Plaintiff cannot seek summary judgment on these claims. Because the claims were withdrawn against Magnotta, Plaintiff cannot now assert the claims against Fox in his supervisory capacity either, because the only underlying violator for whom Fox could be responsible was Magnotta. Accordingly, the only claims that remain at issue are the four claims that the parties have made the subject of their summary judgment motions, as discussed *infra*.

claim under § 1983 (Count VII), but Plaintiff does not. For the reasons set forth below, the Court will deny the Motions in all respects except as to unlawful search, which will be granted in favor of the Defendants.

## II. Statement of Undisputed Facts

The undisputed, material facts at issue are as follows.

At the time of the events giving rise to this lawsuit, Dr. Paul Cosby was a licensed emergency room physician who lived in rural Wayne County, Pennsylvania. (Pl.'s Statement of Material Facts, Doc. 55, at ¶¶ 5, 30.) Despite "not hav[ing] a patient based practice," (*id.* at ¶ 5), he treated a single patient, referred to in the filings as "Jane Doe," for "chronic pain in the form of migraine headaches since the 1970s," (*id.* at ¶¶ 10). Doe was the pastor of the Assembly of the Word Church, which is located on ninety-two acres of land of rural land. (*Id.* at ¶¶ 16, 79-80.) For his part, Cosby "has been a member and contributor of the Assembly of the Word since its inception in the late 1970s." (*Id.* at ¶ 82.) He also appears to be an active member of the church, in that he "also, on occasion, uses the facilities at the Church Lodge, boards his pet in the Church aviary when he is away on locums trips and occasionally stays overnight at the Church Lodge if it fits his travel schedule." (*Id.* at ¶ 48.) Because Doe was the pastor of Cosby's church and a longtime close friend, "all treatment including prescribing and supplying the needed medical items were done at no cost to Patient Doe with a rare exception." (*Id.* at ¶ 16.)

2

In late 2007, the Drug Enforcement Administration (DEA) received notice from a pharmaceutical sales company that Dr. Cosby was making "high volume purchases of [the drugs] Demerol and Dilaudid." (Defs.' Statement of Material Facts, Doc. 64, at ¶ 8.) This information was relayed to Renee Magnotta, an agent for the Pennsylvania Office of the Attorney General's Bureau of Narcotics Investigation and Drug Control, (id. at ¶ 1), and an investigation was commenced, (id. at ¶¶ 7-8).

As part of the investigation, on the morning of April 9, 2008, Magnotta and two DEA agents went on a federal site inspection of Dr. Cosby's property. (Doc. 55 at ¶ 32.) The inspection occurred at Cosby's residence because he "does not maintain an office" and "his residence is the location where his medical records and some of the medications he had ordered were retained." (Doc. 64 at ¶ 10.)

When the agents arrived, Cosby first spoke to them outside his residence. (Doc. 55 at ¶ 34.) During this conversation, Cosby informed the DEA agents that he does not have an office, but rather keeps medication in his home trailer. (Id.) He further indicated that any medication he has is for one single patient. (Id.)

Next, Cosby signed a consent form allowing the investigators to search his "premises." (Id. at ¶ 54; Doc. 64 at ¶ 11.) The consent form informed Cosby of his constitutional right to not have an administrative inspection made in the absence of a warrant, to refuse consent to the inspection, and to withdraw consent at any time. (See DEA Consent Form, Doc. 59, Ex. F, at 1.) It further informed him that "[a]nything of an

3

incriminating nature which may be found may be seized and used against you in a criminal

prosecution." (*Id.*) The consent form does not specify the scope of any search, but simply

indicates that Cosby "voluntarily give[s] consent for inspection of these controlled premises,"

designated as 451 Flat Rock Road, Forest City, Pennsylvania. (*Id.*) "Controlled premises"

are defined in the consent form as "places where original or other records or documents

required under [the relevant provisions of the Controlled Substances Act] are kept or

required to be kept," as well as "places, including factories, warehouses, or other

establishments, and conveyances, where persons registered under [the relevant sections]

may lawfully hold, manufacture, or distribute, dispense, administer, or otherwise dispose of

controlled substances." (*Id.* at 2.)

The agents then proceeded to inspect the premises. Cosby apparently felt some

trepidation in letting the investigators in, in that he "was somewhat embarrassed by the

[unkempt] condition of his living quarters." (Doc. 55 at ¶ 40.) Nonetheless, according to

Cosby, one of the DEA agents responded that "the condition of the living quarters was not

relevant to their Site Inspection." (*Id.*)[2] Despite this professed lack of concern, Magnotta

proceeded to photograph the interior of Cosby's residential trailer, apparently because she

found the inside of the trailer "peculiar." (Doc. 55 at ¶ 56.)

During the course of the inspection, Dr. Cosby also secured the verbal consent of

Patient Doe for the release of her medical records to the government inspectors. (*Id.* at ¶

---

[2] Defendant Magnotta recalls, somewhat differently, only that the investigator "said she 'wasn't concerned about the unkempt trailer.'" (Defs.' Counterstatement of Material Facts, Doc. 69, at ¶ 40.)

4

43.)  Due to space constraints in his trailer, Cosby took his computer to his garage to review

his medical records with the agents.  (*Id.* at ¶ 45.)  Cosby subsequently printed, and the

agents took, 197 pages of printed medical records.  (*Id.* at ¶ 46, 57.)  The agents then

questioned Cosby as to whether he personally uses the medications intended for Doe and

who pays for these medications.  (*Id.* at ¶¶ 47-48.)  The DEA agents (but not Agent

Magnotta) also inspected the DEA Form 222 records that Cosby keeps with respect to the

medications at issue and inventoried the medication, which was kept in a cabinet in Cosby's

trailer.  (*Id.* at ¶¶ 41, 50, 66.)  As to the drugs inventoried, "a certain amount of the drugs

[ordered by Dr. Cosby] were not present."  (Doc. 64 at ¶ 18.)  Moreover, Agent Magnotta

"believed the records provided were inadequate and did not comply with state regulations

based on statements made by [on-scene DEA] Investigator Jackson about the content (or

lack thereof) of the records."  (*Id.* at ¶ 22.)

Following the site inspection, the various agents drove to the Assembly of the Word

Church and photographed the property.  (Doc. 55 at ¶ 68.)  Magnotta admits that, at this

time, she had a theory that Cosby was illegally distributing controlled medications to fellow

church members.  (*Id.* at ¶ 69; *see also* Doc. 69 at ¶ 69 (admitting that, while Magnotta

never characterized the church as "a religious sect," "one of Agent Magnotta's theories was

that Dr. Cosby was possibly dispensing the controlled medications to church members").)

On September 16, 2008, a criminal complaint was filed against Dr. Cosby in a

Susquehana County court, charging him with one felony count of prescribing outside

accepted treatment principles and one misdemeanor count of refusal or failure to keep

required records. (Doc. 55 at ¶¶ 108, 111.) In the time between the site inspection and the

filing of the criminal complaint, Magnotta, among other omissions, never had a medical

professional review Doe's records; never consulted with a medical professional about the

Cosby investigation; never spoke to Doe herself; never performed an audit of Dr. Cosby's

ARCOS prescription ordering information; never reviewed medical manuals to determine if

Cosby's ordering practices were appropriate; and never saw Doe's medical records from the

Hospital of the University of Pennsylvania, which Cosby believes support his chosen

treatments, though as to this latter point Defendants allege that Cosby was asked to provide

these documents but never produced them.[3] (*See generally* Doc. 55 at ¶¶ 94-107.)

Cosby appeared before a magistrate judgment on September 25 for arraignment.

(*Id.* at ¶ 112; Doc. 64 at ¶ 26.) The judge set unsecured bail in the amount of $10,000.

(Doc. 55 at ¶ 112.) Cosby was then fingerprinted, photographed, and processed at the

State Police Barracks in Gibson, Pennsylvania. (*Id.* at ¶ 113; Doc. 64 at ¶ 28.) In the

intervening time, "Dr. Cosby resisted each and every attempt by the Commonwealth to have

him enter a plea to" the conduct at issue. (Doc. 55 at ¶ 110.) Nonetheless, as a result of

the criminal charges, the Pennsylvania Board of Professional and Occupational Affairs

---

[3] (*See* Doc. 69 at ¶¶ 96, 107.)

temporarily revoked Cosby's license to practice medicine, which was not reinstated until 2010. (*Id.* at ¶ 109.)[4]

Finally, on January 20, 2010, the Commonwealth filed a Motion to *Nolle Prosse* both of the criminal charges against Dr. Cosby, based on a lack of probable cause. (*Id.* at ¶¶ 115-116.) The Motion was granted and the charges were withdrawn. (Doc. 64 at ¶ 29.)

### III. **Statement of Disputed Facts**

The material disputed facts primarily center on the existence of probable cause for the search and for any subsequent seizure of Dr. Cosby that may have occurred. Thus, for instance, Cosby asserts that "Agent Magnotta articulated while on the Cosby property that she was certain drug diversion was occurring and she had indicated that the Church to which Dr. Cosby belonged was a cult." (Doc. 55 at ¶ 52.) Cosby argues that Magnotta created theories of criminal liability without basis in fact, solely "as a result of the perception that Cosby was 'different,'" in that he was a "spiritual" individual living in "spartan conditions" in rural Wayne County. (*See* Pl.'s Brief in Supp. of Partial Summ. J., Doc. 54, at 4-5.) Moreover, according to Cosby, Magnotta "had absolutely no facts to support her 'theories,'" which also include the claims "that Dr. Cosby was self abusing the drugs; that Dr. Cosby

---

[4] Defendants only admit that a petition to suspend Dr. Cosby's license was filed. (Doc. 69 at ¶ 109.) They deny the remainder of paragraph 109 as "unsupported." (*Id.*) The Court nevertheless finds sufficient evidence in the record to conclude that the petition to revoke the license was, in fact, granted. For instance, Defendants rely on Cosby's curriculum vitae (Doc. 59, Ex. B) as a definitive statement of his employment history. (*See* Doc. 69 at ¶¶ 5, 7.) Thus, Defendants deny the statement that "Dr. Cosby has been practicing as an emergency room physician for the past thirty years, because his curriculum vitae does not reflect any employment since June, 2008." (*Id.* at 7.) However, that same curriculum vitae states that the reason for Cosby's unemployment was the suspension of his medical license in connection with the criminal charges. (*See* Doc. 59, Ex. B, at 5.) Defendants also admit the fact of suspension in their Answer to the Second Amended Complaint. (*See* Defs.' Answer to Second Am. Compl., Doc. 31, at ¶ 80.)

was giving the drugs to a third party; or that Patient Doe and her husband were redistributing the controlled medications to persons in their 'religious sect.'" (*Id.* at 18.) Instead, Cosby argues, Magnotta disregarded plainly exculpatory evidence to pursue a baseless criminal prosecution. (*Id.* at 17-18.)

Relatedly, there is a dispute as to the scope of the consent form that Cosby signed. Cosby argues that Magnotta's acts of photographing the inside of his trailer exceeded the consent granted. (*Id.* at 21.) The Defendants, on the other hand, argue that the consent form was broad enough to include photography and that, in any event, Cosby never objected to the photography during the site inspection. (*See* Defs.' Brief in Opp. to Pl.'s Mot. for Partial Summ. J., Doc. 68, at 20.)

Though the existence of probable cause and the scope of consent involve legal determinations, they also involve factual components are well-suited for jury determination. *See, e.g.*, *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) ("[T]he question of probable cause in a section 1983 damage suit is one for the jury."); *United States ex rel. Harris v. Hendricks*, 423 F.2d 1096, 1099 (3d Cir. 1970) ("It is settled that the existence and voluntariness of a consent is a question of fact, to be decided in the light of the attendant circumstances by the trier of facts.") (internal quotations and citations omitted).

Finally, it is unclear to what extent the second Defendant, William Fox, who was Magnotta's supervisor at the time, had personal involvement in the events at issue in this case. As discussed in Section V.5., *infra*, Defendant Fox met with Magnotta frequently to

8

discuss ongoing investigations, but it is unclear to what extent he was involved in, knew about, or acquiesced in any actions that Magnotta took with respect to Cosby.

## IV. **Standard of Review**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 265 (1986). Once such a showing has been made, the nonmoving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## V. **Analysis**

As related above, the parties do not dispute a significant amount of material facts. Nonetheless, even though the disputed facts are comparatively few, the Court finds that

9

they are of sufficient materiality to defeat both parties' motions for summary judgment, except as noted below.

## 1. Unlawful Seizure

Cosby's first claim is for an unlawful seizure under section 1983. "To recover under 42 U.S.C. § 1983, [the Plaintiff] must establish that a state actor engaged in conduct that deprived him of 'rights, privileges, or immunities' secured by the constitution or laws of the United States." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). When the conduct alleged is an unlawful seizure, the Plaintiff must show that he was seized without probable cause in violation of the Fourth Amendment. *See, e.g.*, *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995) (discussing elements of a section 1983 claim for false arrest).

However, it should be noted that Cosby's claim for an unlawful seizure is a relatively narrow one. Having already stipulated to the dismissal of his malicious prosecution claim, (*see* Doc. 24), Cosby can no longer assert a claim relating to the conduct of his criminal prosecution. Rather, he can only assert a claim related to his seizure by government authorities and any damages that followed such seizure. *See, e.g.*, *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) ("Malicious prosecution differs from false arrest inasmuch as a claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more.") (internal quotations and alterations omitted)

### a. Existence of a Seizure

In the present case, it is undisputed that Cosby was never arrested in the traditional sense. He was not arrested during the site inspection and later appeared voluntarily before the magistrate for his arraignment, at which point he was released on bail. However, the United States Supreme Court has held that an arrest need not only be effected through direct physical force: "where that is absent, *submission* to the assertion of authority" can constitute an arrest. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690 (1991). As the Third Circuit has interpreted the case law,

> seizures can be of different intensities. Thus, whereas an arrest that results in detention may be the most common type of seizure, an investigative stop that detains a citizen only momentarily also is a seizure. *See Terry v. Ohio*, 392 U.S. 1, 16-18, 88 S. Ct. 1868, 1877-78, 20 L. Ed. 2d 889 (1968). *Terry* demonstrates that the legal distinction between an arrest and an investigative stop is not that one is a seizure and the other is not, but that the police may be able to execute a stop based on circumstances not rising to the level of probable cause for an arrest. *See* 392 U.S. at 2 n.16, 88 S. Ct. at 1879 n.16. This analysis suggests that the restrictions imposed on [the plaintiff, discussed a p. 12, *infra*,] would qualify as a seizure, even though they did not amount to a full blown arrest.

*Gallo v. City of Philadelphia*, 161 F.3d 217, 223 (3d Cir. 1998).

In this respect, Cosby argues that

> [w]hen his criminal defense attorney received a contact advising him that an arrest warrant had issued, Dr. Cosby was threatened by Defendant Magnotta who showed her authority by restraining the liberty of Dr. Cosby by stating that she would come pick him up if he would not surrender.

11

Clearly, Dr. Cosby subjected himself to Defendant Magnotta's assertion of her authority by appearing at the Office of the District Justice with a threat of arrest looming over his head.

(Pl.'s Brief in Opp. to Defs.' Mot. for Summ. J., Doc. 73, at 5.)

In *Gallo v. City of Philadelphia*, *supra*, the Third Circuit found that a criminal defendant who "had to post a $10,000 bond, . . . had to attend all court hearings including his trial and arraignment, . . . was required to contact Pretrial Services on a weekly basis, and . . . was prohibited from traveling outside New Jersey and Pennsylvania" had in fact been seized under the Fourth Amendment. *Gallo*, 161 F.3d at 222. The Circuit subsequently clarified, in more general terms, that, while "[p]retrial custody and some onerous types of pretrial, noncustodial restrictions constitute a Fourth Amendment seizure," merely having to attend one's criminal trial does not. *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005). In the latter case, in finding that no seizure sufficient to support a section 1983 claim occurred under the facts presented, the *DiBella* court noted that the civil plaintiffs "were only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services. Their liberty was restricted only during the Municipal Court trials . . . ." *Id.*

Cosby's pretrial restrictions appear to fit somewhere in between those imposed in *Gallo* and *DiBella*. Unlike the plaintiff in *DiBella*, a warrant was issued for Cosby's arrest.

12

(*See* Notice of Preliminary Hearing and Bail Documentation, Doc. 59, Ex. N, at 5.) While the Court is unaware of any travel restrictions, requirements to report to pretrial services, or other restrictions beyond those incident to the payment of bail, Cosby was required to pay $10,000 in unsecured bail, (*id.* at 7), and was not released until he submitted for fingerprints, (*id.* at 3), and a mug shot, (*see* Mug Shot Photograph of Plaintiff, Doc. 59, Ex. O, at 2.)

While these restrictions could at most give rise to a less obvious seizure than would have occurred if Magnotta physically handcuffed Cosby and brought him to the courthouse, the Court believes they are nonetheless sufficient to create a jury question on whether Cosby was in fact seized. Accordingly, summary judgment will be denied on this ground.

### b. Existence of Probable Cause

As noted above, the existence of probable cause is a question of fact best left for the jury. *See Montgomery*, 159 F.3d at 124. Moreover, "[t]he proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."

13

*United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 593, 160 L. Ed. 2d 537 (2004). In reaching this conclusion, the arresting officer's state of mind is irrelevant; all the factfinder must ask is whether the facts available to the arresting officer objectively gave rise to a finding of probable cause at the time the arrest was made. *Whren v. United States*, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) (summarizing case law and concluding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

However, "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Wilson*, 212 F.3d at 790 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). Nor does

> an arrest warrant issued by a magistrate or judge . . . , in itself, shelter an officer from liability for false arrest. *See Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

*Id.* at 786-87.

14

Consistent with case law, the issues of probable cause in Cosby's case are best left for jury determination. Primarily, there is the question of whether Magnotta disregarded plainly exculpatory evidence when she initiated criminal charges against Cosby and obtained an arrest warrant. The fact that Magnotta did not review a series of records pertaining to the investigation that she might have had access to and which could have exculpated Cosby, as detailed on page 6, *supra*, may be cause for a reasonable jury to find that Magnotta lacked probable cause. This is especially so if the jury were to find, as stated in Plaintiff's statement of facts, that Magnotta was not present when Cosby explained his medical records to the DEA investigators, (*see* Doc. 55 at ¶ 66), that Magnotta was unfamiliar with the appropriate medical practices for a patient in Doe's situation, (*see* Doc. 55 at ¶ 98), and that this lack of knowledge would have led a reasonable officer to doubt the existence of probable cause. On the other hand, a reasonable jury could find that there was sufficient evidence to support probable cause despite these purported shortcomings. In any event, this determination, based as it is on disputed facts and the interpretations of those facts, is one unsuited for the Court's resolution at the summary judgment stage.

Accordingly, the Court will deny the cross-motions for summary judgment as to the unlawful seizure claim.

## 2. Unlawful search

Cosby's next claim is for an unlawful search in violation of section 1983. Because Cosby signed a consent form allowing the investigators to search his "premises," without

specification of where within the premises the investigators were permitted search, the issue

of unlawful search is limited to whether Magnotta exceeded the consent that Cosby gave.

The Supreme Court has "long approved consensual searches because it is no doubt

reasonable for the police to conduct a search once they have been permitted to do so."

*Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 1803, 114 L. Ed. 2d 297 (1991)

(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d

854 (1973)).

Cosby alleges that, even if he did consent to a search of his premises, Magnotta's

act of photographing the inside of his trailer went beyond the scope of his consent. (*See*

Doc. 54 at 21; Doc. 73 at 11.) In ruling on this question, "[t]he standard for measuring the

scope of a suspect's consent under the Fourth Amendment is that of 'objective'

reasonableness—what would the typical reasonable person have understood by the

exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251 (citing *Illinois v.

Rodriguez*, 497 U.S. 183-189, 110 S. Ct. 2798-2802, 111 L. Ed. 2d 148 (1990)).

This Court is aware of no controlling authority addressing whether photography falls

outside the scope of consent to a search as a matter of law.[5]  Other Circuits, however, have

held that unconsented photography during otherwise legal searches does not constitute an

---

[5] Defendants claim that "the Third Circuit has supported and encouraged the taking of
photographs during searches as part of the plain view doctrine." (Brief in Supp. of Defs.' Mot. for Summ. J.,
Doc. 65, at 12.)  However, their only support for this sweeping proposition is an Eastern District of
Pennsylvania case from the year 1983 which mentioned, in the course of a seventeen-page opinion, that
photographs may be authorized under certain circumstances, and which the Third Circuit subsequently
affirmed without opinion. *See United States v, Waxman*, 572 F. Supp. 1136, 1150 (E.D. Pa. 1983), *aff'd*
754 F.2d 49.  The Court cannot derive any precedential policy from such meager authority.

16

unlawful seizure. *See United States v. Mancari*, 463 F.3d 590, 596 (7th Cir. 2006); *Bills v.*

*Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992); *United States v. Espinoza*, 641 F.2d 153, 167

(4th Cir. 1981). Such a position is justified under the plain-view doctrine, which holds that,

for purposes of a Fourth Amendment search, "[i]f an article is already in plain view, neither

its observation nor its seizure would involve any invasion of privacy." *Horton v. California*,

496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990). The Sixth Circuit

summarized the logic of this position when it held:

> In *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987),
> the Supreme Court held that the mere recording of serial numbers of certain
> pieces of stereo equipment did not constitute a seizure because the recording
> "did not 'meaningfully interfere' with respondent's possessory interest in either
> the serial numbers or the equipment . . . ." *Id.* at 324, 107 S. Ct. at 1152. By
> a parallel process of reasoning, it follows that the recording of visual images
> of a scene by means of photography does not amount to a seizure because it
> does not "meaningfully interfere" with any possessory interest. Thus, under
> the Supreme Court's reasoning, photographs taken by the police officers in
> this case would not constitute a seizure. Because the police officers in this
> case were properly on the Bills' premises, they could record by photography
> scenes presented to their plain view.

*Bills*, 958 F.2d at 707.

When we apply such reasoning to the facts of the present case, Cosby's claim

appears increasingly weaker. First, Cosby executed a consent for the investigators to

search, which is not alleged to have been made under duress or under any other condition

that could vitiate the voluntariness of the consent. This means that Magnotta was lawfully

within Cosby's trailer when she took the pictures. Second, there was nothing in the consent

form that limited the scope of the consent being given, nor any allegations that Cosby orally

limited his consent beyond what was specified in the form. And while the Court must evaluate the scope of Cosby's consent under an objective reasonableness standard, there is no reason to believe that photographs of portions of the trailer taken in plain view were unreasonable, given that the Supreme Court has held that a government officer does not violate any expectation of privacy by observing an object in plain view. The case might be otherwise if Cosby had objected to the photographs or placed some kind of limits on the scope of his consent, but no such facts were presented here.

However, the Court need not definitively determine whether the photographs violated Cosby's Fourth Amendment rights because, even if Cosby can argue that he has a Fourth Amendment right against photography despite the existence of a signed consent form without any such limitations, Magnotta would still be protected by qualified immunity.[6]

In deciding whether to grant qualified immunity, the Court must consider two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* The Supreme Court has subsequently relaxed *Saucier*'s two-step structure, and allows district courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

---

[6] Defendants raise the defense of qualified immunity for the search claim only, and not for the seizure claim. (*See* Doc. 65 at 11-13; Doc. 68 at 20-22.) Accordingly, the Court only need consider qualified immunity in the present context.

should be addressed first in light of the circumstances of the particular case at hand."

*Pearson v. Callahan,* 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

Here, while the Court may assume *arguendo* that Cosby could meet *Saucier's* first

prong, his clear failure to meet the second prong and demonstrate a "clearly established

right" makes summary judgment for the Defendants on the unreasonable search claim

appropriate.

A right is clearly established when

[t]he contours of the right [are] sufficiently clear that a reasonable official
would understand that what he is doing violates that right.  This is not to say
that an official action is protected by qualified immunity unless the very action
in question has previously been held unlawful, but it is to say that in the light
of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)

(internal citations omitted).  "This inquiry turns on the on the 'objective legal reasonableness

of the action, assessed in light of the legal rules that were clearly established at the time it

was taken.'" *Pearson,* 555 U.S. at 244 (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.

Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999)).

The Court cannot conclude that a reasonable officer could have believed that taking

photographs of objects in plain view during a consent search was unlawful, because the

state of the law of photography under the plain-view doctrine was unclear at the time that

Magnotta took the photographs (and remains so). *Cf. Wilson,* 526 U.S. at 615 ("In this

case, the appropriate question is the objective inquiry whether a reasonable officer could

19

have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed."). While it is possible to make fine legal distinctions between taking a photograph of an object in plain view and simply looking at the same object, it is not at all clear from a review of the Fourth Amendment case law that the federal courts would or should accept such a distinction. As such, a reasonable officer cannot be expected to make that distinction.

For all of the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to the unlawful search claim, and will deny Plaintiff's Motion as to the same.

### 3. Conspiracy

Next, Defendants seek summary judgment on Count III of Plaintiff's Second Amended Complaint, which alleges a conspiracy to violate section 1983.[7] (*See* Doc. 65 at 13-14.) Plaintiff alleges only that Magnotta and the two DEA agents "conspired with each other to violate Dr. Cosby's rights under the Fourth and Fourteenth Amendments to the United States Constitution." (Second Am. Compl., Doc. 16 at ¶ 106.)

In order to prove a claim of conspiracy to deprive a plaintiff of his civil rights, the plaintiff must prove "that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" *Parkway Garage, Inc. v. City of*

---

[7] Plaintiff does not seek summary judgment on his conspiracy claim. Nor does he seek summary judgment on the supervisory liability claim, discussed in Section V.4, *infra*.

*Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 150, 90 S. Ct. 1598, 1604, 26 L. Ed. 2d 142 (1970)). Cosby argues for the existence of

conspiracy as follows:

> Had the investigatory team left the property of Dr. Cosby and proceeded with
> further investigation or efforts against Dr. Cosby alone, there would be no
> claim of conspiracy. The claim of conspiracy here is based upon the view by
> Agent Magnotta that Dr. Cosby was part of a cult-like religious organization
> that was utilizing the controlled substances he ordered for sacrificial
> purposes.[8]

(Doc. 73 at 15.) Cosby points to further evidence of conspiracy in the facts that, after

leaving his home, the investigators proceeded to his church, trespassed on church property

to photograph the buildings, and began a criminal inquiry against Jane Doe and her

husband. (*Id.* at 15-16.) All of this, Cosby argues is sufficient "circumstantial evidence . . .

to support the inference that Agent Magnotta and the DEA investigators engaged in

concerted or joint action relative to Agent Magnotta's wild theory on the use of the controlled

substances which Dr. Cosby ordered." (*Id.* at 17.)

The Court agrees that the record contains sufficient circumstantial evidence of a

conspiracy to survive summary judgment. If, as discussed above, Magnotta lacked

probable cause to continue with the investigation, and only continued it based on theories

that were not supported by the facts known to her, then there is evidence from which a

reasonable jury could conclude that she acted to deprive Cosby of his civil rights.

---

[8] It is unclear what Plaintiff means by "sacrificial purposes," as it is not apparent from the record
provided that Magnotta believed that the church was using drugs to perform sacrifices. However, as
discussed above, there are reasonable disputes in the record as to whether Magnotta believed that the
drugs were being used for other improper purposes.

Moreover, because the investigators acted in concert with Magnotta in the acts constituting the alleged deprivation when they drove to the church property and photographed the buildings with her, a jury could infer that they "reached an agreement" to engage in acts which violated Cosby's constitutional rights.[9]

Accordingly, Defendants' Motion for Summary Judgment will be denied as to the conspiracy claim.

### 4. Supervisory Liability

Finally, Defendants seek summary judgment on all counts against William Fox, Magnotta's supervisor at the Bureau of Narcotics Investigation and Drug Control. (See Doc. 16 at ¶ 5.) In the Second Amended Complaint, Plaintiff alleged all allegations against Fox in his supervisory capacity. (Id. at ¶ 120.) However, Defendants argue that Plaintiff has not shown that Fox was personally involved in any of the events giving rise to the claim, aside from "routine day-to-day actions of communicating with his staff and reviewing their reports." (Doc. 81 at 17.)

---

[9] In their Reply Brief, Defendants argue that this evidence at most shows a conspiracy to violate the third-party rights of Doe, her husband, and her church, and not Cosby's personal rights. (See Reply Brief in Supp. of Defs.' Mot. for Summ. J., Doc. 81, at 17 ("The only circumstantial evidence cited by Plaintiff points to a potential conspiracy to violate the rights of his religious institution and its Pastor and her husband.").) The Court disagrees. While a jury could conclude that the only rights violated were those of third parties, it could just as reasonably conclude that a substantial purpose of the trespassing and photographing was to build a case against Cosby that was not supported by probable cause. Such a conclusion could support a claim of conspiracy under section 1983, even if the means by which the conspiracy was accomplished consisted solely of violating the rights of third parties, as long as the goal of the conspiracy was to violate Cosby's rights, and as long as such a violation of Cosby's rights did, in fact, occur. Because the Court has already found that there are sufficient questions of fact to reach a jury as to whether Cosby's rights were in fact violated, then the conspiracy claim may proceed to the jury as well.

A "supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)). Even though the Plaintiff must show personal involvement in the alleged wrongs, and may not predicate a section 1983 claim on a theory of *respondeat superior*, "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Therefore, even accepting as true Defendants' argument that "[t]here is no evidence that Supervisor Fox had personal involvement in the filing of charges against Dr. Cosby or the search of his residence/office," (*see* Doc. 65 at 15), the Court still finds that there is sufficient evidence for the supervisory liability claim as to his involvement in other aspects of the investigation to survive summary judgment. As Cosby points out, Fox only supervised six narcotics agents, with whom he conferenced about ongoing investigations daily. (*See* Dep. Test. of William Fox, Doc. 59, Ex. R, at 11:2-12:2.) Moreover, Fox admits to discussing the Cosby investigation with Magnotta, (*id.* at 12:23-13:1), and appears to know at least the basic facts of the case, (*id.* at 41:13-43:21 (stating his understanding that Cosby "was distributing narcotics to two people ["a husband and wife"] in the Honesdale area" and stating that Magnotta showed him photographs of the Does' residence).) Given the small

number of agents that Fox supervised, the frequency with which he discussed ongoing

cases with them, and the fact that he was made at least somewhat aware of the Cosby

investigation during its pendency, a reasonable jury could conclude that Fox knew about

and acquiesced in any violations of Cosby's constitutional rights that Magnotta might have

committed.

Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to

supervisory liability.

## VI. Conclusion

Based on the foregoing considerations, Plaintiff's Motion for Summary Judgment

(Doc. 52) is **DENIED** and Defendants' Motion for Summary Judgment (Doc. 62) is

**GRANTED IN PART** and **DENIED IN PART**.  A separate Order follows

Robert D. Mariani
United States District Judge